## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

SAM SADEGHI,                      )
    Plaintiff,                )
                    )
       v.                     )     Case No. 1:16-cv-219
                    )
INOVA HEALTH SYSTEM,              )
    Defendant.               )
                    )

### MEMORANDUM OPINION

Plaintiff Sam Sadeghi, an Iranian-born naturalized American citizen who is Muslim, filed this Title VII action against defendant Inova Health System, alleging that defendant unlawfully discharged him because of his race, religion, and national origin, and also unlawfully retaliated against him for filing discrimination complaints with defendant's Human Resources department. Following full discovery, defendant filed a motion for summary judgment. As this motion has been fully briefed and argued orally, it is now ripe for disposition.

### I.

Central to the summary judgment analysis is whether the record reflects that the material facts are undisputed or genuinely disputed. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, the first step in a summary judgment analysis is to ascertain whether the asserted material facts are undisputed. As such, Local Rule 56(B) and the Rule 16(B) Scheduling Order provide a framework to assist in this analysis.

Pursuant to Local Rule 56(B), the movant's brief must "include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed,"

and the non-movant's response brief must "include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Local Civil Rule 56(B).  The Scheduling Order provides that a motion for summary judgment must contain a separately captioned section listing in numbered-paragraph form all material facts as to which the movant contends no genuine dispute exists, and that the non-movant's opposition brief must include "a separately captioned section within the brief addressing, in numbered-paragraph form corresponding to the movant's section, each of the movant's enumerated facts and indicating whether the non-movant admits or disputes the fact with appropriate citations to the record." *Sadeghi v. Inova Health Sys.*, No. 1-16-cv-219 (E.D. Va. Aug. 2, 2016).  The Scheduling Order further states that the "Court may assume that any fact identified by the movant as undisputed in the movant's brief that is not specifically controverted in the non-movant's brief in the manner set forth above is admitted for the purpose of deciding the motion for summary judgment." *Id.*

Defendant complied with Local Rule 56(B) and the Scheduling Order; plaintiff did not. Plaintiff instead provided his own alternative statement of undisputed material facts that does not correspond to the numbered paragraphs in defendant's statement of undisputed material facts. Plaintiff also provided a short statement of disputed material facts which also does not correspond to defendant's numbered paragraphs.  Plaintiff's alternative statement "of [plaintiff's] own interpretation of the facts" does not comply with either Local Rule 56(B) or the Scheduling Order, thereby making "it difficult to determine exactly which material facts are disputed." *Integrated Direct Marketing, LLC v. May*, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015).

2

As a result, the statement of undisputed material facts listed here is derived from defendant's statement of undisputed material facts, many of which plaintiff does not specifically dispute. As for plaintiff's alternative statement of facts, that statement has been scoured for facts that might reasonably be viewed as in conflict with the facts stated here. Where such disputes appear, plaintiff's facts are either immaterial or not supported by admissible record evidence, as required by Rule 56(c)(2), Fed. R. Civ. P. For example, plaintiff supports multiple factual assertions with citations only to his unverified complaint, which is insufficient at the summary judgment stage to create a genuine dispute of material fact. *See Higgins v. Scherr*, 837 F.2d 155, 156–57 (4th Cir. 1988) ("[T]he opponent of a summary judgment motion has a burden of showing, by proper affidavits or other evidence, the existence of a genuine dispute of material [fact] and cannot simply rest upon his unverified complaint.").

## II.

- Plaintiff is an Iranian-born, naturalized American citizen and a Muslim.

- Defendant Inova Health System is a nonprofit healthcare system based in Northern Virginia. Defendant employs over 16,000 people.

- In April 2001, Houshang Falahatpour, who, like plaintiff, is an Iranian-born American citizen and a Muslim, was the Laboratory Manager for defendant's emergency rooms in Springfield, Reston, and Fairfax, Virginia.

- Falahatpour hired plaintiff Sam Sadeghi, also an Iranian-American Muslim, in 2001 as a part-time Medical Technologist at defendant's Reston Emergency Care Center. In 2003, Falahatpour moved plaintiff to a full-time Medical Technologist position, a position for which he was qualified.[1]

---

[1] Plaintiff argues that he was a "devoted" employee, noting that he worked overtime whenever necessary, went "above and beyond" to serve defendant's patients, and reported concerns about patient health information. Pl.'s Br. at ¶¶ 8–9. Defendant does not dispute those facts, but they are immaterial because plaintiff was not discharged for lack of devotion to the company, nor did his discharge have anything to do with his reporting, or failing to report, problems or concerns.

- From 2002 to 2006, Falahatpour was plaintiff's direct supervisor and conducted plaintiff's annual performance evaluations.

- Defendant's employee performance evaluations have two components. First, the supervisor rates the employee's job performance based on the requirements in each employee's job profile. Plaintiff received scores in seven different categories, such as reporting accurate data and providing quality specimens for lab testing. Second, the supervisor rates the employee with respect to defendant's Standards of Behavior, which are part of every employee's job description. The Standards of Behavior include traits such as professionalism, positive attitude, ethics, and courteousness. Supervisors rank employees on a 1 through 5 scale in each category.[2] A score of 1–1.99 is "unsatisfactory," a score of 2–2.99 is "provisional" or "new employee," a score of 3–3.99 is "competent," a score of 4–4.49 is "commendable," and a score of 4.5–5 is "distinguished." Def. Ex. E. The job performance scores are then weighted as 60% of the total score, and the behavioral score is weighted as 40% of the total score. *Id.*

- Defendant uses the evaluations to assess strengths, weaknesses, and areas for improvement; the evaluations are not used to determine salaries or raises.

- Defendant received a total score of 3.5 on his first performance evaluation in August 2002. Pl. Ex. F. The record does not disclose his behavioral score on this evaluation.

- Plaintiff received a total score of 4.219 on his April 2003 performance evaluation. Def. Ex. E. Plaintiff's scores on his job performance categories ranged from 3.5 to 4.7, and his behavioral score was a 4.5. *Id.*

- Plaintiff received a total score of 3.514 on his April 2004 performance evaluation. Def. Ex. F. Plaintiff's scores on his job performance categories ranged from 3.0 to 4.2, while his behavioral score decreased to 3.2. *Id.*

- In January 2005, Falahatpour issued plaintiff a written warning regarding plaintiff's behavior. Falahatpour's warning informed plaintiff that the "primary concerns have been the poor working relationship you have exhibited with clients and the improper response to performance issue notices from the staff and myself." Def. Ex. G. Falahatpour's warning to plaintiff included six examples of plaintiff's inappropriate behavior: (i) sending a client an inappropriate note, (ii) an unacceptable response to an inquiry from a hospital regarding the labeling of stool specimens, (iii) failing to respond to criticism, or responding in an unacceptable fashion, (iv) complaining about a heavy work load, even though plaintiff spent a lot of time on the phone for personal phone calls, (v) taking discussions too personally, being argumentative and disrespectful, and having a negative

---

[2] Defendant used a 100–500 scale for the performance evaluations in some years instead of a 1–5 scale, but the scale is the same (*i.e.*, a score of 400 out of 500 equals a 4 out of 5). The 1–5 scale is used here for consistency.

attitude, and (vi) becoming angry, argumentative, and disrespectful in a counseling session. *Id.*[3]

- Plaintiff received a total score of 3.08 on his May 2005 evaluation. Def. Ex. H. Plaintiff's scores on his job performance categories ranged from 3.0 to 3.8, while his behavioral score again decreased, this time to 2.7. *Id.* The evaluation cited several examples of plaintiff's poor behavior, including being disrespectful, argumentative, and sending an inappropriate note to a client. *Id.* The evaluation stated that plaintiff needed to improve his professional conduct by (i) exhibiting greater courtesy and respect, (ii) exercising "emotional control and communicating in a calm manner," (iii) having a "positive and constructive relationship with the management team," and (iv) engaging in "[e]ffective conflict resolution." *Id.*

- Plaintiff received a total score of 3.389 on his May 2006 evaluation. Def. Ex. I. His scores on his job performance categories ranged from 3.4 to 4.2, and his behavioral score increased slightly to 3.0. *Id.* The evaluation noted that Falahatpour had seen "significant improvement" in plaintiff's behavior. *Id.*

- Falahatpour testified that, overall, plaintiff's job performance through 2006 was acceptable, but his behavior was not. Def. Ex. C at 30–31. Falahatpour had to speak with plaintiff many times about plaintiff's behavior with coworkers. *Id.*

- In 2006, defendant promoted Falahatpour to Administrative Director for Emergency Rooms. In turn, Falahatpour promoted his laboratory coordinator, Ann Osborn, to Laboratory Supervisor. Falahatpour retained the authority to discharge employees; Osborn did not have that authority.

- Because Osborn was promoted to Laboratory Supervisor, she was now responsible for supervising plaintiff.[4] Osborn had never managed employees before her promotion to Laboratory Supervisor. Plaintiff testified that Osborn was direct and had a loud voice.

- In December 2006, Osborn and another employee, Karen Hara, had a conversation in which Hara told Osborn that Hara had concerns with the violence and unrest in Iran. In

---

[3] Plaintiff disputes defendant's characterization of the 2005 written warning as a "formal" warning, but plaintiff does not dispute that he received the warning and does not challenge its contents. Whether the warning was formal or informal is immaterial, as the level of formality has no bearing on whether plaintiff succeeds or fails on his discrimination and retaliation claims. *See Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) ("A fact is material if it might affect the outcome of the suit under the governing law.") (quotation marks omitted).

[4] Although plaintiff cites only to his complaint to support his assertion that Osborn is a white, non-Muslim female, defendant does not dispute this fact.

this conversation, Hara did not make any comments about Muslims or plaintiff. Osborn nevertheless advised Hara to refrain from commenting on Iran because Osborn did not feel such comments were appropriate. Osborn ended the conversation with Hara and did not hear Hara make any similar comments in the future. As a result, Osborn felt that she had adequately addressed the problem and did not discipline Hara.

- On December 11, 2006, Osborn met with plaintiff to counsel him verbally in relation to his violations of defendant's Standards of Behavior.

- Osborn prepared an agenda for this meeting that included several examples of plaintiff's unprofessional behavior in late 2006, such as raising his voice to colleagues, being rude and argumentative, and making a "sexist" comment about a "girls club" in an argument with a supervisor. Def. Ex. K.[5]

- The meeting lasted about two-and-a-half hours. Plaintiff was not receptive to the issues listed in the agenda, and Osborn described his attitude as "defensive." Def. Ex. J. at 85.[6]

- Falahatpour testified that plaintiff "had a problem with authority," was not "coachable," and that these problems continued after Osborn became plaintiff's supervisor. Def. Ex. C. at 45.

- On January 17, 2007, plaintiff filed a complaint with defendant's Human Resources department, alleging discrimination on the basis of race, religion, and national origin. Plaintiff alleged that Osborn had made "serious accusations" against him, referring to the December 2006 meeting. Def. Ex. L. Plaintiff further alleged that another employee had made "outrageous assertions" against plaintiff by telling Falahatpour that patients were not being taken care of during plaintiff's shift. *Id.*

---

[5] Plaintiff asserts that several of the items in Osborn's agenda were later determined to be false, citing the fact that Falahatpour responded "yes" when asked in his deposition if he remembered "any incidents where Ms. Osborn made allegations about Mr. Sadeghi that turned out to be false." Pl. Ex. D at 43. As defendant points out, however, Falahatpour changed his answer to that question from "yes" to "no" in an errata sheet that was filed before plaintiff submitted his response brief. Pl. Ex. Z. Apart from his unverified complaint, plaintiff does not point to any other evidence for his assertion that the incidents listed in the agenda were later shown to be false. Accordingly, his attempt to create a genuine dispute of fact on this point fails, as the allegations in his complaint are not part of the summary judgment record.

[6] Plaintiff asserts, without record support, that Osborn denied his request on January 10, 2007 for paid time off without first trying to find another employee who could cover plaintiff's shift. Plaintiff's citation to Osborn's deposition testimony does not support this assertion. Instead, Osborn testified that Falahatpour denied plaintiff's request because another full-time employee was already on paid time off during the time plaintiff requested. And even if there is a dispute in this regard, it is immaterial.

- In his January 2007 complaint, plaintiff listed two instances in which employees had made allegedly racist remarks: (i) the December 2006 conversation between Hara and Osborn,[7] and (ii) another conversation in December 2006 between Hara and an employee named Robert Benedotto in which Hara made "some unflattering racist remarks" about plaintiff, which Benedotto reported to plaintiff.[8] Def. Ex. L. Plaintiff did not make any accusations of discrimination against Falahatpour, who was copied on the complaint.

- Plaintiff concluded his January 2007 complaint by stating that "[i]t seems to be very popular these days for other employees to jump to conclusions. They see all the negative news about the Middle East and want to make us responsible." *Id.*

- Human Resources Director Katy Reeves met with plaintiff about his complaint and told him that she would personally investigate it. Human Resources contacted Osborn about her conversation with Hara. Human Resources ultimately determined that plaintiff's complaint did not have any validity.

- On March 2, 2007, plaintiff filed another complaint with Human Resources, alleging that Osborn was retaliating against him for reporting discrimination in his January complaint.[9]

---

[7] Plaintiff asserted in his January complaint that an unidentified patient overheard Osborn making racist remarks, but the patient's comments are inadmissible hearsay and therefore cannot be considered on summary judgment. *See Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (stating that plaintiff must offer "sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial"). As a result, there is no dispute of material fact between Osborn's testimony that she never made any comments about Muslims or plaintiff and plaintiff's assertion, based on hearsay, that she did.

[8] Plaintiff also asserts that an unidentified employee asked plaintiff why plaintiff did not wear a rag on his head, and that another employee expressed dislike of plaintiff's need to pray five times a day. Pl.'s Br. at ¶ 16. Assuming these statements are even admissible, they are immaterial because plaintiff puts forth no evidence that either Osborn or Falahatpour was aware of them. Indeed, Osborn testified in her deposition that besides her conversation with Hara, she never heard anyone else making any comments about Iranians or Muslims.

[9] Plaintiff asserts that Osborn denied his request on January 29, 2017 to attend a language training seminar, but that she allowed him to attend the seminar after he filed his March complaint. The record evidence plaintiff cites does not support this assertion. Plaintiff asked Osborn to allow him to attend a "replacement" seminar, suggesting that Osborn had already approved him for the seminar. Pl. Ex. O. Moreover, Osborn denied plaintiff's request to attend a February seminar only because of a scheduling conflict with another employee, and she eventually approved him for an April seminar. No facts suggest that Osborn denied plaintiff the opportunity to attend the seminar out of a retaliatory animus; to the contrary, she approved him to attend the seminar.
    Plaintiff, citing his deposition testimony, also asserts that he was denied a raise after he passed the training, but his testimony does not indicate that he should have gotten a raise, nor

- Plaintiff stated in his March 2007 complaint that he had "been getting a large number of unnecessary write-ups from Ms. Osborn," which began at the time he submitted his January complaint. Def. Ex. N. As an example of a write-up, plaintiff referenced a letter he received from Osborn on February 9, 2007 instructing plaintiff to enter his extra time into defendant's time system.

- Although plaintiff characterized Osborn's letter as a "write-up," Osborn was acknowledging that plaintiff had worked overtime and asked him to fill out the appropriate documentation in accordance with company policy. Def. Ex. O. Osborn did not object to plaintiff's overtime work, telling him that "[t]he extra time you worked is legitimate since you needed to stay because your replacement was late." *Id.* Plaintiff nevertheless believed that Osborn sent him the letter in order to document his behavior.

- On March 5, 2007, Falahatpour and Osborn met with plaintiff and issued plaintiff a performance improvement plan ("PIP"), dated February 27, 2007, which detailed plaintiff's behavioral deficiencies and set forth steps for improvement.

- Osborn prepared the PIP before plaintiff filed his March 2007 complaint, and she was unaware that he had filed his March 2007 complaint with Human Resources when Osborn and Falahatpour met with plaintiff on March 5, 2007 to discuss the PIP. Falahatpour also reviewed the PIP and removed some of the documentation Osborn attached.

- Plaintiff received the PIP because he violated defendant's Standards of Behavior. Def. Ex. Q at 1. In particular, plaintiff violated the following Standards of Behavior: (i) "Commitment to Colleagues," which plaintiff violated by being rude and disrespectful toward co-workers, making sexist comments, and becoming angry and losing his temper; (ii) "Professionalism," which plaintiff violated by writing unprofessional letters to supervisors when requesting vacation time; and (iii) "Accountability/Personal Responsibility," which plaintiff violated by refusing to sign time logs and working unauthorized overtime hours.

- Plaintiff was also placed on the PIP because he had violated defendant's absentee policy by having four unscheduled absences.

- The PIP listed multiple criteria for improvement, including being respectful to colleagues, ceasing angry and rude behavior, and complying with defendant's time-keeping requirements.

---

does it show that he applied for or was eligible for a raise. *See* Pl. Ex. C at 160. He does not cite a company policy or any other document indicating that he should have received a raise. As a result, this asserted fact is not supported by competent record evidence.

- When Osborn and Falahatpour met with plaintiff, Falahatpour asked plaintiff to let Osborn start the meeting and not interrupt her. After Osborn began to speak, plaintiff interrupted her and spoke for most of the meeting. Osborn took notes during the meeting. According to Osborn's notes, plaintiff said that defendant's Standards of Behavior were "bullshit," accused Osborn of making derogatory comments about Iranians, and thanked Osborn for "ruining [his] day" at the end of the meeting. Def. Ex. R.

- The PIP contained an "acknowledgment," which stated that "[f]ailure to meet the above stated expectations will result in actions up to and including termination." Def. Ex. Q at 3. Plaintiff signed the acknowledgment, but wrote on the PIP that the PIP was "retaliation of [a] person who does not like person [sic] of Iranian and middle eastern descent and she goes out of her way to make these unfounded allegation[s] that [have] proved in the past not to be true." *Id.*

- Plaintiff received his annual performance evaluation in April 2007. During this time, Human Resources was still investigating plaintiff's March 2007 complaint. Plaintiff received an overall score of 3.29 on his performance evaluation. Def. Ex. S. Plaintiff's scores on his job performance categories ranged from 3.0 to 4.0, and his behavioral score was a 2.8. *Id.* The evaluation included several goals for plaintiff, including (i) controlling his temper, (ii) demonstrating courtesy and respect, (iii) ceasing any rude, disrespectful, and angry behavior, and (iv) filling out the proper documentation for exceptions to his regular work hours. *Id.*

- In July 2007, Osborn attempted to counsel plaintiff about his violation of one of defendant's "Red Rules."

- At that time, defendant had a policy known as the "Red Rule" system to increase patient safety. The first Red Rule was to identify the patient correctly all the time, and the second rule was to perform the right test on the right patient at the right time. If an employee violated a Red Rule, a supervisor would meet with the employee within several days of the violation to counsel the employee.

- On July 19, 2007, Osborn learned that plaintiff violated the second Red Rule by ordering the wrong test on a patient on July 12, 2007. *See* Def. Ex. T.

- In keeping with the Red Rule policy, Osborn approached plaintiff to discuss the violation with him on July 19, 2007 (the "Red Rule Meeting").

- Before the Red Rule Meeting, plaintiff told Osborn that he refused to talk with her without a witness. Jason Long (Facility Director), Carlos Boakye (a security guard),[10] and Deborah Skidgel (a registrar) eventually gathered with Osborn and plaintiff in a room.

---

[10] Plaintiff asserts, citing only his complaint, that he asked Boakye to attend the Red Rule Meeting because plaintiff did not feel safe speaking with Osborn.

9

- In the course of the Red Rule Meeting, Osborn told plaintiff two or three times that she needed to conduct a Red Rule counseling with him, but he refused and stated that he would talk only with Falahatpour. Falahatpour was unavailable because he was on vacation during that time. Osborn testified that plaintiff was shouting during the Red Rule Meeting and that he stood directly in front of her, pointing his finger in her face.

- Although plaintiff did not verbally threaten Osborn, hit her, or have to be physically restrained, Osborn nevertheless considered his behavior threatening, and other participants also perceived his behavior to be threatening and disrespectful. Plaintiff also did not sign the Red Rule violation form that Osborn had prepared. Def. Ex. T.

- After the incident, Osborn telephoned Falahatpour and told him about the Red Rule Meeting. She also informed Human Resources about the Red Rule Meeting.

- In her letter to Human Resources, Osborn recounted what happened at the Red Rule Meeting. Def. Ex. U. Osborn stated that plaintiff "displayed unprofessional and disrespectful conduct" toward Osborn and Long, was unable to control his temper, and insulted her. *Id.* Osborn also contacted defendant's Compliance Hotline because she did not feel safe inside the building with plaintiff because of his violent temper.

- Falahatpour called Reeves and asked her to investigate. Reeves asked Deborah Engle, a Human Resources employee, to interview the Red Rule Meeting attendees. Reeves also asked Engle to send Reeves any information concerning plaintiff's disciplinary history. Reeves noted in her email to Engle that plaintiff's actions in the Red Rule Meeting would be a "cause for action on their own." Def. Ex. V.

- Under defendant's Progressive Discipline Policy, disciplinary infractions are divided into "Group I Violations" and "Group II Violations." Def. Ex. W. Group I violations include infractions such as unsatisfactory work performance and failure to give notice of absence. Group I violations are subject to a four-step disciplinary process: (i) a verbal reminder, (ii) a written reminder, (iii) a suspension, and (iv) planned termination. Group II violations include infractions such as mistreatment of a patient or employee, insubordination (defined as "disrespectful behavior towards a supervisor or refusal to perform work properly assigned by a supervisor"), and repeated failure to obey Group I rules. If an employee violates Group II rules, he is suspended without pay until Human Resources can investigate the infraction. If the facts warrant discharge, the employee is discharged.

- Engle interviewed Boakye and Skidgel to determine what happened during the Red Rule Meeting.

- Boakye stated that plaintiff's voice was "loud," plaintiff was "mad," and that Osborn was also mad at plaintiff. Def. Ex. V.

- Skidgel reported that the Red Rule Meeting was "horrible; absolutely horrible." *Id.* Skidgel stated that plaintiff was aggressive, ranting, and accusatory toward Osborn. *Id.* Skidgel also stated that she thought plaintiff was going to hit Osborn. *Id.*

- Neither Boayke nor Skidgel provided any facts that were inconsistent with Osborn's version of the events at the Red Rule Meeting.

- Long also wrote a letter to Reeves, Engle, and Falahatpour in which he recounted his version of the Red Rule Meeting. Long stated that plaintiff initially refused to speak to Osborn, but that Long told plaintiff that Osborn had to counsel him about the Red Rule violation. Long stated that he and Osborn attempted to counsel plaintiff on the violation, but that plaintiff "escalated," yelled at Osborn, and pointed a pen at her. Def. Ex. X. Long stated that plaintiff "displayed blatant disregard for [Osborn's] position as his manager." *Id.*

- Although Engle did not interview plaintiff, plaintiff spoke to Falahatpour and explained plaintiff's version of the Red Rule Meeting.

- Falahatpour testified that he had to decide whether to discharge plaintiff based on Human Resources' investigation of the Red Rule Meeting, and that Osborn could not decide whether to discharge plaintiff.

- Falahatpour reviewed the statements from Boakye, Long, and Skidgel in deciding whether to discharge plaintiff. Falahatpour also spoke to plaintiff.

- Falahatpour ultimately decided to discharge plaintiff.[11]

- Falahatpour and Reeves met with plaintiff on July 30, 2007, and discharged him.

---

[11] Plaintiff asserts that Falahatpour did not decide to discharge plaintiff or, at the very least, Falahatpour did so in conjunction with the Human Resources employees and Osborn. The record evidence flatly contradicts that assertion. To begin with, Falahatpour testified multiple times that he alone, as director, had the authority to discharge plaintiff. *See, e.g.*, Pl. Ex. D at 85, 86, 89, 90, 98, 99, 117. Although Falahatpour acknowledged that he consulted with Human Resources about the decision, and based his decision on Human Resources' investigation, consulting with Human Resources does not mean that Human Resources had final authority to discharge plaintiff. Indeed, defendant's Progressive Discipline Policy requires the Human Resources Director to "advise the department director about the propriety of the termination action." Def. Ex. W at 4. The fact that Human Resources drafted plaintiff's discharge letter, or even that Human Resources recommended plaintiff be discharged, also does not mean Human Resources had final authority to discharge plaintiff. Accordingly, no genuine dispute of fact exists on this issue because no reasonable juror could conclude that anyone other than Falahatpour made the ultimate decision to discharge plaintiff. Moreover, even were this fact genuinely in dispute, it is immaterial because there is no competent record evidence indicating that Osborn or anyone in Human Resources acted with any discriminatory or retaliatory animus.

- Falahatpour and Reeves gave plaintiff a discharge letter that Human Resources drafted. Human Resources misspelled Falahatpour's name on the letter, so he crossed out the misspelling and corrected it before signing the letter.

- The discharge letter summarized the conversation that day.  In particular, the letter stated that plaintiff's actions on July 19, 2007, "were insubordinate and were perceived as threatening to another employee." Def. Ex. Y.[12]  The letter further stated that plaintiff's behavior represented "a pattern that ha[d] been discussed with [him] before, documented in performance evaluations, and the cause of a previous performance improvement plan," and that the incident on July 19, 2007 was "of such a nature that we believe the safety of your fellow staff members is at risk." *Id.*

- After Falahatpour decided to discharge plaintiff, Falahatpour telephoned plaintiff and left him a voicemail.  Falahatpour testified that he was calling plaintiff to offer his sympathies and offer any help, such as a reference, that plaintiff might need.  Falahatpour repeatedly testified that he called plaintiff in order to calm plaintiff down and make sure that plaintiff did not go back to the hospital and get in trouble, noting that plaintiff had a history of having a temper.  Falahatpour also noted that Human Resources drafted the letter and misspelled Falahatpour's last name.  At one point in the voicemail, Falahatpour described plaintiff's discharge as "bullshit" in an effort to calm plaintiff down.[13]

---

[12] Plaintiff denies that he was disrespectful in Red Rule Meeting, and also denies that his conduct was a "Group II" violation that would result in his immediate discharge without a final warning. Plaintiff, however, does not dispute that Skidgel, the registrar who witnessed the Red Rule Meeting, described the Red Rule Meeting as "absolutely horrible" and stated that plaintiff was "ranting" and was "very accusatory" toward Osborn.  Def. Ex. V.  Plaintiff also does not deny that Long stated in his letter to Human Resources that plaintiff blatantly disrespected Osborn. Def. Ex. X.  Furthermore, plaintiff's citation to the Fairfax County Office of Human Rights and Equity Programs Final Investigative Report does not support plaintiff's assertion that he did not act disrespectfully.  To the contrary, the Report indicates that plaintiff did not sign the Red Rule violation form that Osborn brought to the Red Rule Meeting. *See* Def. Ex. T.  Finally, plaintiff's citation to his complaint is insufficient at the summary judgment stage.  As a result, there is no genuine dispute of material fact that he acted disrespectfully during the Red Rule Meeting, which means that his behavior was insubordinate and was therefore a Group II violation under defendant's Progressive Discipline Policy. *See* Def. Ex. W. at 4.

Because his insubordination was a Group II violation, plaintiff is also incorrect that he should have received a final warning before his discharge.  Under defendant's Progressive Discipline Policy, Group II violations require "immediate decision-making suspension or termination." *Id.*  And even if a final warning were required, plaintiff's PIP specifically warned him that further disrespectful behavior would "result in actions up to and including termination." Def. Ex. Q.

[13] The fact that Falahatpour referred to plaintiff's discharge as "bullshit" does not create any genuine dispute of fact on this issue.  Falahatpour stated that he used that term only in an effort

- Plaintiff argues that Falahatpour admitted that defendant's employees did not like Falahatpour because he was Iranian, citing Falahatpour's deposition testimony. Pl. Ex. D at 100. A fair reading of Falahatpour's testimony, however, shows that Falahatpour stated that defendant, a company with over 16,000 employees spread across multiple hospitals, likely employed a few prejudiced individuals. Falahatpour repeatedly stated that no employee had ever personally made disparaging comments to Falahatpour or exhibited any prejudice toward him as an Iranian-born Muslim. As a result, Falahatpour's statement about the possible existence of prejudice on the part of some employees at a large company are immaterial as to whether plaintiff was discharged because of his race, religion, or national origin.

- Indeed, Falahatpour testified that he discharged plaintiff based on his insubordinate behavior at the Red Rule Meeting, not because of his race, religion or national origin. Def. Ex. C at 117–18.

### III.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A "fact is material if it might affect the outcome of the suit under the governing law." *Vannoy*, 827 F.3d at 300 (quotation marks omitted). A "dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (quotation marks omitted). The movant bears the burden of showing an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the non-moving party, to defeat the motion, must set forth specific facts showing that there is a genuine issue for trial. *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007). The facts must be construed "in the light most favorable" to the non-movant, and all reasonable inferences must be drawn in the non-movant's favor. *Vannoy*, 827 F.3d at 300. Only "disputes over facts that might affect the

---

to comfort plaintiff and calm him down after his discharge, and as result this stray comment does not cast doubt on the multitude of facts establishing that Falahatpour discharged plaintiff. *See Am. Arms Int'l v. Herbert*, 563 F.3d 78, 82 (4th Cir. 2009) ("[A] nonmovant cannot defeat summary judgment with merely a scintilla of evidence.").

outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Plaintiff claims that defendant violated Title VII by unlawfully discharging him based on his race, religion, and national origin. *See* 42 U.S.C. § 2000e-2(a)(1). Plaintiff further claims that defendant unlawfully retaliated against him under Title VII for filing discrimination complaints. Plaintiff does not and cannot contend that he can establish unlawful discharge or retaliation based on direct evidence, and accordingly the *McDonnell-Douglas*[14] burden-shifting test applies to his discharge and retaliation claims. *Lettieri v. Equant Inc.*, 478 F.3d 640, 646, 649 (4th Cir. 2007). Under the first step of that test, the plaintiff "has the burden to establish a prima facie case." *Id.* at 646. If plaintiff can establish a prima facie case of discrimination, then the "burden shifts to the employer at the second step to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (quotation marks omitted). If the employer does so, the burden returns to the plaintiff "to show that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id.* (internal quotation marks omitted). In this event, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination." *Id.* (quotation marks and brackets omitted).[15] At the third step, "the burden to demonstrate pretext merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination." *Id.* at 646–47 (quotation marks and brackets omitted). With these principles in mind, plaintiff's claim for unlawful discharge based on his race, religion, and national origin and his retaliation claim are separately addressed.

---

[14] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[15] *See also Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 143 (2000).

## A.

Title VII prohibits an employer from "discharg[ing] any individual . . . because of such individual's race, . . . religion, . . . or national origin." 42 U.S.C. § 2000e-2(a)(1).  To establish a prima facie case of discrimination under Title VII, plaintiff must show "(1) that he is a member of a protected class; (2) that he suffered from an adverse employment action; (3) that he was performing at a level that met his employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 219 (4th Cir. 2016).  Defendant does not contest that plaintiff is a member of protected classes, nor does defendant contest that his discharge was an adverse employment action.  Furthermore, there are no record facts as to whether defendant replaced plaintiff with another employee outside the protected classes, and defendant presents no argument on this point.[16]  As a result, the only issue at this step is whether plaintiff was performing at a level that met defendant's legitimate expectations.

In this respect, plaintiff argues that despite his history of behavioral infractions, he can establish that he was satisfying defendant's legitimate expectations because of his track record of good job performance.  Plaintiff cites the fact that he never received an overall score of less than 3.084 on his performance evaluations, including an overall score of 3.29 on his 2007 performance evaluation.  In response, defendant argues that plaintiff's documented history of insubordination and misbehavior is enough, by itself, to show that plaintiff did not satisfy defendant's legitimate expectations.  Specifically, defendant points to plaintiff's track record of

---

[16] Plaintiff fails to produce record facts on this fourth element, claiming that the passage of time makes it too difficult to identify whether plaintiff was replaced by someone outside of the protected classes.  Although plaintiff's failure to adduce these facts further supports the conclusion that he cannot establish a prima facie case, the summary judgment analysis here does not depend on that point.

poor scores on the behavioral component of his performance evaluations, as well as numerous instances in which his supervisors counseled him with regard to his behavior.

Defendant is correct that poor job behavior, by itself, is a sufficient reason to conclude that plaintiff failed to meet defendant's legitimate expectations. As the Fourth Circuit has stated, the "anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (4th Cir. 1999). Put differently, Title VII "was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981).[17] Here, defendant's expectations for plaintiff's behavior are set forth in defendant's Standards of Behavior, which apply to all employees, and include expectations such as respectful behavior, courtesy, and having a positive attitude. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515–16 (4th Cir. 2006) (noting that employers can provide evidence of their expectations for employees).[18] In assessing whether plaintiff complied with these expectations, the Fourth Circuit has made clear that "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quotation marks and alterations omitted).[19]

---

[17] A contrary conclusion — that employers could discharge employees only upon a showing of poor job performance — would lead to the nonsensical situation where a perfect employee could get away with any manner of insubordination, regardless of how that misbehavior disrupted the workplace. Although Title VII is not a "general civility code," it surely does not bar an employer from taking appropriate steps to discipline, and, if necessary, discharge unruly employees, no matter how well they perform their jobs. *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008) (quotation marks omitted).

[18] No record facts suggest that the Standards of Behavior are a "sham designed to hide [defendant's] discriminatory purpose or [are] somehow not legitimate." *Warch*, 435 F.3d at 518 (citation and quotation marks omitted).

16

The record facts conclusively show that plaintiff's supervisors perceived him as insubordinate and disruptive, and therefore plaintiff failed to comply with defendant's legitimate expectations. To begin with, plaintiff received consistently low behavior scores on his performance evaluations beginning in 2004: 3.2 in 2004, 2.7 in 2005, 3.0 in 2006, and 2.8 in 2007.[20] In December 2006, Osborn met with plaintiff to counsel him concerning plaintiff's failure to meet defendant's Standards of Behavior, citing unprofessional conduct such as (i) raising his voice to coworkers, (ii) being rude and argumentative, and (iii) making a sexist comment in an argument. In March 2007, Osborn placed plaintiff on a PIP because he continued to exhibit rudeness, anger management issues, and an overall lack of professionalism. The PIP specifically warned plaintiff that any future outbursts or disrespectful behavior would result in his discharge. Plaintiff's April 2007 performance evaluation again cited those same behavioral problems. Finally, the undisputed facts show that plaintiff was disrespectful and insubordinate when Osborn attempted to counsel him about his Red Rule violation on July 19, 2007, behavior that was fully consistent with his history of poor conduct. In light of these facts, it is no surprise that plaintiff admits in his brief that he had a "history of behavioral infractions." Pl.'s Br. at 18. Given these behavioral infractions, and the common sense principle that employers "must retain

---

[19] *See also King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) ("[Plaintiff's] own testimony, of course, cannot establish a genuine issue as to whether [plaintiff] was meeting [the employer's] expectations."). The Fourth Circuit has also stated that "[h]ospitals have historically wide discretion to make decisions regarding their medical staff" with respect to both job qualifications and "factors beyond technical medical skills." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 218 (4th Cir. 2002); *see also Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006) (noting this point in the context of a Title VII unlawful discharge claim against a hospital).

[20] Although only conduct that is "reasonably close to the time of the challenged employer action" is relevant in unlawful discharge cases, plaintiff's history of poor behavioral scores is relevant insofar as plaintiff argues that he had always received positive performance evaluations. *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 244 (4th Cir. 1982).

17

the power to discipline and discharge disobedient employees," plaintiff cannot establish that he

was satisfying defendant's legitimate expectations at the time of his discharge. *Armstrong*, 647

F.2d at 448.[21]

Even assuming plaintiff were able to establish a prima facie case of discrimination, his

Title VII discrimination claims would still fail the rest of the *McDonnell-Douglas* test.  At the

second step, defendant must "articulate a legitimate, nondiscriminatory reason for the adverse

employment action." *Lettieri*, 478 F.3d at 646 (quotation marks omitted).  Defendant's burden at

this step is "one of production, not persuasion." *Warch*, 435 F.3d at 514 (quotation marks

omitted).  Defendant satisfies this burden:  Insubordination is a legitimate, nondiscriminatory

reason for discharge because Title VII does not insulate workers from "the consequences of

insubordination." *Ziskie*, 547 F.3d at 229.[22]  As stated in plaintiff's discharge letter, defendant

discharged plaintiff because his conduct at the July 19, 2007 Red Rule Meeting was

"insubordinate and [was] perceived as threatening to another employee."  Def. Ex. Y.  The letter

---

[21] *See also Spease v. Pub. Works Comm'n of City of Fayetteville*, 369 F. App'x 455, 456 (4th Cir. 2010) (unpublished) (concluding that plaintiff failed to satisfy the third prong because he was insubordinate); *Morrall v. Gates*, 370 F. App'x 396, 398 (4th Cir. 2010) (unpublished) (concluding that plaintiff failed to satisfy the third prong where she "demonstrated disrespectful and disruptive conduct," and her "relationship with her supervisors was difficult").  Defendant relies on the Fourth Circuit's *King* decision to argue that plaintiff cannot satisfy the third prong because of his poor behavior, but the plaintiff in *King* displayed both poor performance and poor behavior, and as a result that case is inapposite.  *See King*, 328 F.3d at 147–48.

[22] *See also Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 515 (7th Cir. 1999) ("Insubordination is a legitimate, nondiscriminatory reason for firing an employee."); *Pearlman v. Pritzker*, 564 F. App'x 716, 719 (4th Cir. 2014) (unpublished) ("[I]nsubordination, poor workplace demeanor, or angry outbursts [ ] can constitute a legitimate and nondiscriminatory basis for taking an adverse employment action."); *Kelly v. Boeing Co.*, ___ F. Supp. 3d ___, 2016 WL 7217661, No. 1:16-cv-196, at *4 (E.D. Va. Dec. 12, 2016) ("Defendant has articulated a legitimate reason for Plaintiff's termination:  Plaintiff's supervisors observed that she repeatedly engaged in inappropriate and unprofessional conduct.  An employee's unprofessional and disruptive behavior is a legitimate, nondiscriminatory reason for discipline and termination, as is terminating an employee under a progressive disciplinary policy.").

further stated that his "behavior represent[ed] a pattern that [had] been discussed with [plaintiff] before, documented in performance evaluations, and the cause of a previous [PIP]." *Id.* As a result, defendant meets the requirement of showing a legitimate, nondiscriminatory reason for plaintiff's discharge.

At the third step, the burden shifts to plaintiff "to show that [defendant's] proffered permissible reason[s] for taking an adverse employment action [are] actually a pretext for discrimination." *Lettieri*, 478 F.3d at 646 (quotation marks omitted). To establish pretext, plaintiff must show that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017) (quotation marks omitted). The Fourth Circuit has made clear that courts do not sit as "super-personnel department[s] weighing the prudence of employment decisions," and that once an employer "articulates a reason for discharging the plaintiff not forbidden by law, it is not [courts'] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for plaintiff's termination." *DeJarnette*, 133 F.3d at 299 (quotation marks omitted). Furthermore, plaintiff's "own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989).

Plaintiff argues that one of defendant's purported reasons for firing him — that Osborn perceived his behavior during the July 19, 2007 Red Rule Meeting as threatening — was false. Plaintiff points to several facts to support this argument: (i) Osborn initially requested to speak with plaintiff alone, which plaintiff argues belies Osborn's claim that she was afraid of plaintiff, and that it was plaintiff who actually requested that Boakye, a security guard, be present during

the Red Rule Meeting (ii) Osborn was also mad at the Red Rule Meeting, while plaintiff's voice was only at a medium level, and (iii) plaintiff never made any verbal threats or had to be physically restrained. Plaintiff's argument in this respect fails for two reasons.

First, the undisputed facts show that terminating plaintiff for his threatening behavior was a credible ground for discharge. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007) (stating that courts should focus on whether the decisionmaker "believed its stated reason [for the discharge] to be credible" when assessing pretext) (quotation marks omitted). Human Resources' investigation of the July 19, 2007 Red Rule Meeting, which served as the basis for Falahatpour's decision to discharge plaintiff, confirmed Osborn's account of plaintiff's behavior. Skidgel described the Red Rule Meeting as "absolutely horrible," and stated that she thought plaintiff was going to hit Osborn. Def. Ex. V. Long stated that plaintiff "displayed blatant disregard for [Osborn's] position as his manager." Def. Ex. X. And plaintiff does not dispute that Osborn called defendant's Compliance Hotline after the Red Rule Meeting because she did not feel safe inside the building given plaintiff's temper. In sum, the record facts make clear that there was a credible reason for plaintiff's discharge.

The facts plaintiff offers to cast doubt on this ground for his discharge fall short. For instance, the fact that Osborn initially requested to speak to plaintiff alone is immaterial because at that point she did not know how plaintiff would react in the Red Rule Meeting. Moreover, the fact that plaintiff requested that a security guard be present because he did not feel safe with Osborn is irrelevant,[23] as the fact that plaintiff may have felt unsafe speaking alone with Osborn did not preclude Osborn from also feeling threatened by his actions during the Red Rule

---

[23] Plaintiff supports this assertion only with a citation to his complaint, which is insufficient at the summary judgment stage.

20

Meeting. Finally, the fact that Osborn was also upset at the Red Rule Meeting does not preclude Osborn from feeling threatened by plaintiff, nor does the lack of any explicit verbal or physical threats mean that Osborn could not have reasonably perceived plaintiff's behavior as threatening. Finally, the other employees who attended confirmed Osborn's version of the Red Rule Meeting. Skidgel stated that the Red Rule Meeting was "absolutely horrible" and that plaintiff looked as if he might hit Osborn, while Long stated that plaintiff was blatantly disrespectful to Osborn. Def. Exs. X, V. In sum, terminating plaintiff for his threatening behavior during the Red Rule Meeting was a credible, nonpretextual ground for discharge.[24]

The second reason plaintiff's pretext argument fails is because he ignores that he was discharged not only for his threatening behavior, but also for his insubordinate conduct. Defendant's Progressive Discipline Policy defines insubordination as "disrespectful behavior towards a supervisor." Def. Ex. W. As seen above, the undisputed facts establish that plaintiff was disrespectful toward Osborn, his superior, during the Red Rule Meeting. This ground for discharge was therefore also credible and nonpretextual.[25]

---

[24] Plaintiff also asserted at oral argument that the decision to discharge him was made before the investigation ever took place because Reeves, who emailed Engle and asked Engle to investigate what happened at the Red Rule Meeting and where plaintiff was in the disciplinary process, wrote in the email that plaintiff's purported actions at the Red Rule Meeting were a "cause for action on their own." Ex. V. Reeves was simply referring to the fact that plaintiff's purported actions during the Red Rule Meeting were a ground for discharge under defendant's Progressive Discipline Policy. Nothing in the email indicates that the decision to discharge plaintiff was already made, and indeed Falahatpour testified multiple times that only he could make that decision.

[25] It is further worth noting that any inference of discrimination is significantly reduced by the fact that Falahatpour is the person who both hired and discharged plaintiff. *See Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("When the hirer and firer are the same individual, there is a powerful inference relating to the ultimate question that discrimination did not motivate the employer.") (quotation marks omitted). Falahatpour, like plaintiff, is also an Iranian-born Muslim, which further reduces any inference of discrimination. *Orgain v. City of Salisbury*, 305

In sum, plaintiff fails to satisfy any step of the *McDonnell-Douglas* test because he cannot establish a prima facie case of discrimination and he cannot show that defendant's legitimate, nondiscriminatory reasons for his discharge were a pretext for unlawful discrimination. As a result, summary judgment must be granted to defendant on plaintiff's Title VII unlawful discharge claim based on plaintiff's race, religion, and national origin.

## B.

The next issue is whether plaintiff's retaliation claim — that defendant unlawfully retaliated against plaintiff by terminating him after he filed his discrimination complaints with Human Resources in January and March 2007 — survives summary judgment. A review of the record discloses that plaintiff's retaliation claim fares no better than his discriminatory discharge claim.

The *McDonnell-Douglas* burden-shifting test governs plaintiff's unlawful retaliation claim. *Lettieri*, 478 F.3d at 649. Plaintiff must first establish a prima facie case of retaliation. *Id.* at 646. If he can do so, the burden shifts to defendant to articulate a legitimate, non-

---

F. App'x 90, 103 (4th Cir. 2008) (unpublished) ("Although the fact that a [decision-maker] is a member of the same protected class as the plaintiff does not preclude a successful discrimination claim, it substantially weakens any inference of discrimination.") (quotation marks and alterations omitted).

Plaintiff argues that these inferences do not apply here because Falahatpour did not discharge plaintiff, but the record evidence does not support that assertion. *See supra* n. 11. Plaintiff also argues that these inferences only apply when an employee is hired and discharged in a relatively short span of time, whereas in this case defendant employed plaintiff for about six years. *See Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995) (noting that the defendant was aware of plaintiff's Iranian descent "just five months earlier when it hired him and allegedly promised him a promotion, making it especially unlikely that he was denied a promotion because of bias against his national origin"). Nothing in that decision, however, indicates that the passage of time weakens these inferences. And in any event, relying on these inferences is not even necessary here because plaintiff has failed to establish that defendant's reasons for terminating plaintiff were pretextual.

discriminatory reason for plaintiff's discharge. *Id.* If defendant does so, then the burden returns to plaintiff to show that defendant's purported reason for the discharge is pretextual. *Id.*

To establish a prima facie case of retaliation, plaintiff must show that he (i) "engaged in protected activity," (ii) that defendant "took adverse action against" him, and (iii) that "a causal relationship existed between the protected activity and the adverse employment activity." *Guessous*, 828 F.3d at 217. Defendant does not dispute that plaintiff's discrimination complaints qualify as protected activity, nor does defendant contest that it took an adverse employment action against plaintiff by discharging him. As a result, the only issue with respect to whether plaintiff can establish a prima facie case of retaliation is whether a causal relationship exists between plaintiff's filing of the discrimination complaints in January and March 2007 and his discharge in July 2007. Plaintiff argues that a causal relationship exists because of the short spans of time between his complaints and discharge, as well as (i) the denial of a training opportunity, (ii) placement on the PIP, (iii) a low performance evaluation score, (iv) denial of a raise, and (v) the Red Rule counseling incident. This argument fails.

As plaintiff acknowledges, the six and four month gaps between his January and March 2007 discrimination complaints and his discharge on July 30, 2007 are insufficient, without additional facts, to show a causal relationship. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (approvingly citing a Tenth Circuit case which held that a 3-month period was insufficient to establish a causal relationship and a Seventh Circuit case which held that a 4-month period was insufficient).[26] Nor do the five additional facts plaintiff offers to establish

---

[26] *See also Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (approvingly citing a Tenth Circuit case holding that a four-month gap between protected activity and discharge is not enough to establish a causal relationship); *Atkins v. Holder*, 529 F. App'x 318, 321 (4th Cir. 2013) (unpublished) (four months insufficient); *Perry v. Kappos*, 489 F. App'x 637, 643 (4th

causation rescue his retaliation claim. First, plaintiff's argument that he was a denied a training opportunity misstates the facts; the record shows that Osborn did not allow him to attend the training seminar because of a scheduling conflict with another employee, and that she told plaintiff that she would try to schedule him for a seminar at a later date, which she did. In sum, this incident is neither evidence of discrimination nor of causation. Second, plaintiff's placement on a PIP is not an adverse employment action in these circumstances, as the facts show that he received the PIP because of his history of behavioral infractions, and that placement on the PIP did not harm plaintiff's employment conditions. *See Pulley v. KPMG*, 348 F. Supp. 2d 388, 394 (D.M.D. 2004) (concluding that placement on a PIP was not an adverse employment action where the PIP did not "adversely alter the conditions of [the plaintiff's] employment"). As a result, placement on the PIP does not aid plaintiff in showing causation for retaliation purposes.[27] Third, plaintiff's low behavior score on his April 2007 performance evaluation does not establish that Osborn acted with any sort of retaliatory animus or show causation, as plaintiff's score and the behavioral problems identified in his 2007 evaluation were consistent with plaintiff's scores and behavioral problems dating back at least to 2005. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651–52 (4th Cir. 2002) (concluding that a "disciplinary discussion" and a low score on an employee evaluation did not constitute adverse employment actions where plaintiff failed to show that the discussion or score "affected the terms, conditions, or benefits of his

───────────────────────────────

Cir. 2012) (unpublished) (three months insufficient); *Pascual v. Lowe's Home Ctrs.*, 193 F. App'x 229, 233 (4th Cir. 2006) (unpublished) (three to four months insufficient).

[27] Osborn also decided to place plaintiff on the PIP before she even knew he had filed the March complaint, which undermines any argument that placement on the PIP was retaliation for that complaint. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("[T]he employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case.").

employment").[28]   Fourth, with respect to his claim that he was denied a raise, this purported fact

also does not establish causation.  Plaintiff's citation to his testimony does not clearly show that

he should have received a raise, as he testifies only that he received a certificate in health

interpretation, but never mentions anything about a raise.  Pl. Ex. C at 159–60.  And he cites no

other evidence, such as defendant's compensation policies or rules, showing that he should have

received a raise after receiving a certificate.  As a result, there is no competent record evidence

which shows that he should have received a raise.  Fifth and finally, plaintiff does not contest

that he violated one of defendant's Red Rules and that this violation was the reason Osborn

attempted to counsel him on July 19, 2007; nothing in the record suggests that plaintiff's Red

Rule violation was linked to any retaliatory animus, and thus this fact also cannot establish

causation.

In sum, these facts viewed in the light most favorable to plaintiff point convincingly to

the conclusion that plaintiff cannot establish a causal relationship between his complaints and his

discharge.  Instead, the undisputed facts show that he was discharged because of his

insubordination and misbehavior on July 19, 2007, which was the culmination of a lengthy

history of poor conduct.

Even assuming *arguendo* that plaintiff could establish a prima facie case of retaliation,

his retaliation claim would nonetheless founder on the remaining steps of the *McDonnell-

Douglas* test.  As stated above, defendant satisfies the second step by proffering a legitimate,

nondiscriminatory reason for plaintiff's discharge.  *See supra* Part II.A.  And as for the third step,

---

[28] *See also Prince-Garrison v. Md. Dep't of Health & Mental Hygiene*, 317 F. App'x 351, 353
(4th Cir. 2009) (unpublished) ("[R]eprimands for insubordination, meetings with supervisors,
and directions to attend counseling . . . do not constitute adverse employment actions.").

plaintiff cannot show that the reasons for his discharge were pretextual. *Id.*[29] In particular, plaintiff has to show at this step that he would not have been discharged "but for" defendant's alleged retaliation. *Foster v. Univ. of Maryland-Eastern Shore*, 878 F.3d 243, 252 (4th Cir. 2015). Given plaintiff's undisputed history of insubordination, combined with his conduct during the July 19, 2007 Red Rule Meeting, it follows that plaintiff simply cannot show that he would not have been discharged but for his filing of the two discrimination complaints. As a result, summary judgment must be granted to defendant on plaintiff's retaliation claim.

## IV.

For the foregoing reasons, defendant's motion for summary judgment is granted.

An appropriate order will issue.

Alexandria, Virginia
April 5, 2017

/s/

T. S. Ellis, III
United States District Judge

---

[29] Defendant points to the Fourth Circuit's decision in *Buchhagen v. ICF International, Inc.*, 650 F. App'x 824 (4th Cir. 2016) (unpublished), to argue that plaintiff cannot show that defendant's reasons for discharging plaintiff were pretextual. The *Buchhagen* court concluded that "no reasonable jury could conclude" that the employee in that case was discharged "for any reason other than [the company's] legitimate business interests" given the employee's "continued insubordination." *Id.* at 829–30. As plaintiff points out, however, *Buchhagen* is not on all fours with this case because the employee in that case, unlike plaintiff in this case, had problems with job performance, not just insubordination. *Id.* at 830. In any event, whether *Buchhagen* is on all fours with this case is immaterial because plaintiff cannot show that defendant's proffered reasons for terminating him were pretextual.